# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 14, 2009

## ALTON TAPPAN v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-01325     John T. Fowlkes, Jr., Judge**

---

**No. W2008-02063-CCA-R3-PC  - Filed September 3, 2010**

---

After a jury trial, Petitioner Alton Tappan was convicted of aggravated burglary and theft of property valued at $1,000 or more but less than $10,000.  He was given an effective sentence of 14 years incarceration.  His conviction was affirmed on appeal.  He then filed a petition for post-conviction relief, claiming he received ineffective assistance of trial and appellate counsel.  After an evidentiary hearing, the post-conviction court denied relief.  We conclude that appellate counsel's failure to raise the issue of the trial court's failure to charge circumstantial evidence was deficient performance and that the failure was prejudicial.  We therefore remand the case to the trial court for a new trial on the theft conviction.  The judgment of the post-conviction court is affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed in Part, Reversed in Part; Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

R. Andrew Hutchinson, Memphis, Tennessee, for the Petitioner, Alton Tappan.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Chris West, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

Our decision on direct appeal summarized the circumstances leading to Petitioner's conviction as follows:

Viewed in the light most favorable to the State, the evidence at trial established that on the morning of October 3, 2004, Elizabeth Young parked her 2000 Ford Taurus on the street across from her church, located at Park and Marechalneil in Orange Mound, and attended Communion services. When she left the church at approximately 1:45 p.m. to return home, she discovered that her vehicle was missing. She contacted local law enforcement officers and reported the theft. A few days later, Ms. Young was watching television and recognized her vehicle on a local evening news broadcast. She later identified and retrieved her vehicle from the police impoundment lot.

At trial Ms. Young identified a photograph of her car, although she said that the wheels were different. The car shown in the photograph had a distinctive license plate, "Z by B," which Ms. Young explained meant "Zeta by Beta," her sorority. Ms. Young testified that her stolen vehicle was "in pretty good shape" and had been driven approximately 21,000 miles prior to the theft. She purchased the automobile in 2000 for $23,000. Ms. Young estimated that the value of the vehicle as of the date it was stolen was "probably between nine and [$]10,000."

Larry Gafford, who lived at 3524 Marianne in a duplex family residence, testified that on October 5, he awoke at approximately 9:50 a.m. because someone was "aggressive[ly] knocking" on his door. He looked out a window, and because he did not recognize the vehicle in the driveway, he did not answer the door. He testified that the vehicle was a dark blue Ford Taurus, and he identified a photograph of the vehicle taken outside his residence.

Mr. Gafford testified that he laid down on his couch, and at that point he heard "another noise knocking on the next-door neighbor's door." He looked through his front-door window and saw two men "prying open the iron door and kick[ing] in the wooden door" to the neighbor's residence. Mr. Gafford described one of the men as shorter than six feet tall, weighing 135 to 140 pounds, black, and wearing a white shirt and tennis shoes. The other man was approximately six feet and three inches tall, weighing over 200 pounds, black, and wearing dark colored clothing, "[b]luish gray."

Mr. Gafford testified that he retrieved his pistol and called the police department. Over the telephone, Mr. Gafford gave "an exact description as [the intruders] were going in and out" of the neighbor's residence carrying electronic equipment and a jewelry box. Mr. Gafford remained on the telephone until the police officers arrived.

-2-

When the officers arrived, one of the intruders was coming out of the house, and the other man was setting a stolen item at the vehicle. When the intruders saw the officers, they "eluded to the side and went through the back door or through the side of the house" and escaped through "the backyard." In addition to the officers' personal observations, Mr. Gafford also supplied the responding officers "a full description of what [the intruders] were wearing, their size, their activities, [and] exactly what they were doing." Mr. Gafford saw the men again approximately 45 minutes later after the officers located and detained them. The officers brought the intruders separately to Mr. Gafford to see if he could identify them. Mr. Gafford testified that he identified the men as "the two guys that [he] saw actually break into the house 3 feet away from [his] face."

Mr. Gafford admitted that when he testified at [Petitioner's] preliminary hearing, he did not identify [Petitioner] or the other intruder. He explained at trial, "Because instead of myself making a mistake at the time I would of rather used the testimony that I gave earlier to the police officers, to the detectives, to the 911 operator. If you put all of these together and you put exactly what I say what they were wearing, it should match up directly to their booking sheet." Mr. Gafford did, however, identify [Petitioner] at trial.

On cross-examination, Mr. Gafford stated that he had worked four hours on the night of October 4 at Young Avenue Sound Studio. He went home shortly after midnight and fell asleep on his couch. Mr. Gafford denied having consumed any alcohol or narcotics that evening.

When asked on cross-examination to name the color of the intruders' eyes, Mr. Gafford replied that "[f]or the most part" he just saw the backs of their heads and the sides of their faces. Mr. Gafford said that he remained inside his residence until the police officers arrived and the intruders fled. He then walked outside and spoke with one of the officers. According to Mr. Gafford, the police officers captured one of the intruders "fairly quickly off the bat within like the first three or four minutes." The officers captured the second intruder approximately 45 minutes later. The officers drove the intruders separately to the break-in site, and Mr. Gafford testified that he identified each suspect by the clothing they were wearing.

Defense counsel challenged Mr. Gafford's in-court identification of [Petitioner], particularly because Mr. Gafford failed to identify [Petitioner] at the preliminary hearing. Counsel alleged that Mr. Gafford "identified this man

because he's a male black," to which Mr. Gafford replied, "No. I identified that gentleman there as the guy that did the break into the house."

Adriana Morales, who lived with her daughter at the burglarized residence, testified that on the morning of October 5, 2004, she took her daughter to a doctor's appointment. She returned to the residence and "saw a lot of police cars in the street." She spoke with the officers, learned what had happened, and went to the police station to give a statement. At trial, she identified numerous photographs depicting the damage to her residence and items of personal property, such as a television and stereo equipment that had been moved to her porch and stereo speakers inside the trunk of an unknown blue vehicle parked in her driveway.

Memphis Police Officer Shan Hicks testified that he responded to a call reporting a "prowler" at 3526 Marianne. He saw two individuals on the front porch carrying electronic equipment and a jewelry box. One of the individuals was dressed in a blue suede jogging suit, and the officer recalled that the other man was wearing a white tee shirt. At trial, the officer identified [Petitioner] as one of the men on the porch.

As Officer Hicks got out of his police vehicle, the men ran "towards the back of the house." Officer Hicks pursued, but he lost sight of the intruders when he reached the backyard, at which point he broadcast on his radio a description of the intruders. Officer Hicks returned to the front of the residence and observed the blue vehicle in the driveway and numerous items of personal property inside the vehicle. From its license plate, the officer identified the registered owner of the vehicle and determined that the vehicle was stolen. At trial, the officer could not recall the name of the vehicle's owner.

Officer Hicks identified photographs of the residence's interior, the "kicked-in" front door, and items on the front porch. The officer recalled that the items on the porch shown in one of the photographs had been removed from the backseat of the blue Taurus after crime scene officers had processed the area. Officer Hicks testified that other officers in the area apprehended two men and transported them to the scene where Officer Hicks identified them as the intruders he had seen.

On cross-examination, Officer Hicks estimated that he was able to observe the intruders for 10 to 15 seconds. He also estimated that he saw their faces "briefly for a second before they ran off." He testified that the men captured

-4-

and returned to the scene had dark colored eyes. The man in the jogging suit was wearing a hat, and the other man had a "fade cut." The officer testified that he could not tell if the men had any scars or gold teeth. Officer Hicks affirmed that the second suspect who was in custody and transported to the scene 30 to 40 minutes later had been stopped behind a Papa John's pizza parlor located only one or two blocks from Ms. Morales's residence.

The defense presented testimony from one witness, Officer Alvin Davis, who arrested the defendant "in front of the Papa John's" in the "700 block of South Highland" at 11:08 a.m. The officer testified that the arrest site is the "next street over" from 3526 Marianne. When the officer saw [Petitioner], [Petitioner] was "walking across the street from another residen[ce], like right across from the pizza place . . . carrying a pizza box walking toward the Papa John's."

On cross-examination, Officer Davis explained that he arrested [Petitioner] because he matched the description of one of the men who had burglarized a residence in the area and because [Petitioner] appeared suspicious walking with a pizza box toward, not away from, the pizza parlor.

State v. Alton Tappan, No. W2006-00168-CCA-R3-CD, 2007 WL 1556657, at *1-3 (Tenn. Crim. App. at Jackson, May 29, 2007).

Shortly after we affirmed Petitioner's conviction, he filed a pro se petition for post-conviction relief. He was appointed counsel, who then filed an amended petition. The petitions claim, among other things, that Petitioner was denied his constitutional rights to effective trial and appellate counsel. On appeal, Petitioner has distilled his ineffective assistance of counsel claims down to three points: (1) trial counsel failed to adequately inform him of the potential sentences he faced, thus preventing him from making an informed decision regarding a plea offer; (2) trial counsel failed to procure a mental evaluation for him; and (3) appellate counsel neglected to raise an issue on direct appeal regarding the trial court's failure to instruct the jury regarding circumstantial evidence.

Two witnesses testified at the post-conviction hearing.[1] Petitioner testified that he was represented by appointed counsel in the case. He met with counsel several times prior to trial. Immediately after trial he thought she "did a pretty good job."

---

[1] As noted above, on appeal Petitioner has discarded some of the claims in his petitions. We limit our recitation of the record to the evidence relevant to the issues before us.

He later changed his mind. Petitioner testified that he did not believe counsel adequately explained his options with respect to the State's plea offer or his potential sentencing exposure upon conviction after a trial. Although Petitioner has an extensive criminal history, he did not think he was a candidate for "an enhancement," and therefore prior to trial he thought his sentence would be somewhere between five and eight years. He testified that he did not know the actual range at which he could be sentenced. Petitioner acknowledged that the trial judge questioned him regarding the alternate plea offers proposed by the State. Petitioner was on probation at the time of this offense, and he knew he would have to complete a four-year term for the prior offense. The State offered two alternatives: one proposing a five-year sentence to be served concurrently with the prior sentence; and one proposing a three year sentence to be served consecutively to the prior sentence. Petitioner rejected both offers.

Petitioner also told the post-conviction court that he had been diagnosed with depression. He testified that he was under a lot of stress at the time of trial, but counsel never sought a mental evaluation for him.

Counsel, a licensed attorney since 1993, testified at the post-conviction hearing that she had handled a variety of criminal matters, including capital cases. She met with Petitioner immediately after her appointment to the case. In addition, she met with him four other times, each for around thirty to forty-five minutes. She also began negotiating with the State for a plea deal.

Counsel explained the range of sentences facing Petitioner. As part of that discussion, she informed him that, because he qualified as a career offender, he was subject to automatic sentences of fifteen and twelve years if he were convicted. She further explained that those sentences could be consecutive, meaning Petitioner was potentially exposed to an additional twenty-seven years after completing his prior sentence. Counsel believed Petitioner fully understood the possible outcomes and the ramifications of his plea options. But, counsel testified, Petitioner wanted to serve no more than three years, which was not possible given the State's offers. He rejected the offers. Prior to trial, the trial judge explained the offers, questioned Petitioner about them, and confirmed that he wanted to reject them.

Counsel noted that, as part of her discussions with any client, she constantly evaluates whether the client comprehends what she is saying. She made that evaluation throughout her representation of Petitioner, and she did not recall any signs that Petitioner was unable to understand their discussions. Moreover, she specifically asked Petitioner if he had a history of mental illness, and he told her he did not. In short, counsel testified that she did not find any indication that Petitioner had mental problems. Furthermore, she explained that even if

Petitioner was depressed at the time of trial, she did not believe that was a valid defense. Therefore, she did not ask that he undergo a mental evaluation.

Finally, counsel, who was also Petitioner's counsel on direct appeal, testified that she raised what she believed to be every meritorious issue on appeal. She acknowledged that she did not seek a jury instruction at trial concerning circumstantial evidence. She explained that she did not believe it was necessary. Likewise, she explained that, because she believed the instruction was unnecessary, she did not raise its absence as an issue on appeal.

The post-conviction court took the matter under advisement and then issued an order denying relief. The court concluded that Petitioner failed to demonstrate that counsel was ineffective for failing to seek a mental evaluation. It also found that she was not ineffective for declining to argue on appeal that a circumstantial evidence jury instruction was necessary, specifically noting that if both direct and circumstantial evidence are present then such an instruction is not needed. The post-conviction court did not address Petitioner's claim that counsel was ineffective for not properly advising him about his plea options.

Petitioner now raises these three issues on appeal.

## II. Analysis

To be successful in his claim for post-conviction relief, Petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). On appeal, we conduct a de novo review of the post-conviction court's findings of fact, but we presume its findings are correct "unless the evidence preponderates against [them]." Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001); see also State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). We do not "reweigh or re-evaluate the evidence or substitute [our] inferences for those drawn by the [post-conviction] court. Furthermore, questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction] judge." Fields, 40 S.W.3d at 456 (citation omitted). However, a claim of ineffective assistance of counsel is a mixed question of law and fact, see Burns, 6 S.W.3d at 461, and we review the post-conviction court's conclusions of law, "such as whether counsel's performance was deficient or whether that deficiency was prejudicial," purely de novo, "with no presumption of correctness," Fields, 40 S.W.3d at 458.

Because Petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he "bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, Petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

Petitioner first contends that his defense counsel did not adequately inform him of the possible sentencing ramifications in choosing to proceed to trial or his options with respect to the State's plea offers. Although not specifically addressed by the post-conviction court, our review of the record reveals that this claim does not merit relief. While Petitioner testified that he was not aware of the ranges of punishment he faced by going to trial and was not fully aware of the State's offers, he acknowledged that the trial judge questioned him to assure herself that he was making an informed decision to reject the State's offers. In addition, counsel testified that she explained Petitioner's options to him fully and specifically informed him that he faced possible sentences of 15 and 12 years for the charges. Counsel also told him that the trial court could impose consecutive sentences. Furthermore, she informed Petitioner of the State's proposals, but, she testified, Petitioner rejected them because he did not want a sentence longer than three years. Thus, there is no clear and convincing evidence that counsel's performance was constitutionally deficient. Regardless, there is no evidence of prejudice. Assuming he was not fully informed of the ranges of punishment he faced, Petitioner did not testify that he would have taken the plea if had been given that information. Indeed, the evidence suggests that he would have rejected the offers because they required a sentence of more than three years. Thus, Petitioner has failed to establish either prong of the Strickland test.

Second, Petitioner contends his defense counsel was ineffective in failing to procure a mental evaluation for him. This argument is also unpersuasive. There is little-to-no evidence in the record suggesting that counsel was deficient in not seeking a mental evaluation. Petitioner testified that he had been diagnosed with depression, that he "probably was" depressed at the time of trial, and that he was under stress at the time. This evidence does not suggest reasonable counsel would have sought an evaluation for Petitioner. Moreover, counsel explained that she constantly evaluates her clients' ability to understand the proceedings. Counsel testified that throughout her representation, she never had any indication that Petitioner had mental problems. Consequently, we conclude that counsel was not deficient for not seeking an evaluation. Regardless, there is no evidence in the record

that had a mental evaluation been conducted, the result of the case would have been different. Nothing indicates Petitioner's depression and stress were sufficient to render him incompetent to stand trial or otherwise avoid responsibility for the crime. As a result, Petitioner has not provided sufficient evidence to satisfy the Strickland test on this issue.

Finally, Petitioner argues that counsel was ineffective on appeal because she did not argue that the trial court erred by not giving an instruction regarding circumstantial evidence. A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990), superceded by statute on other grounds as stated in State v. Reid, 91 S.W.3d 247 (Tenn. 2002). Accordingly, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n.20 (Tenn. Crim. App. 1994). Indeed, "there is a positive duty upon a trial judge to give the jury a complete charge on the law applicable to the facts of the case." Id. at 149. While a guilty verdict can be based exclusively upon circumstantial evidence, see State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999), in order to sustain the conviction the facts and circumstances of the offense "must be so strong and cogent as to exclude every other reasonable hypothesis save the [defendant's] guilt," State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). When a prosecution rests entirely on circumstantial evidence, the defendant is entitled to an instruction regarding this rule of law. See Tenn. Pattern Instr. – Crim. 42.03, cmt. 1; see also State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975); Monts v. State, 379 S.W.2d 34, 40 (1964).

Here, although there was direct evidence that Petitioner committed the aggravated burglary of the residence, there was only circumstantial evidence that he stole Ms. Young's car. Counsel testified that she did not request the instruction because she thought it was not necessary. However, based upon the record, we conclude that counsel should have requested the instruction. The only evidence that Petitioner stole the car was the fact that he and his co-defendant possessed it during a robbery two days later. The circumstantial evidence instruction would be appropriate in this case, and reasonable counsel would have raised this issue at trial or on appeal. Counsel's failure to do so was thus constitutionally deficient. See Goad, 938 S.W.2d at 369; Baxter, 523 S.W.2d at 936.

Counsel's failure was also prejudicial. See Strickland, 466 U.S. at 694. But because Petitioner has framed this claim as ineffective assistance of *appellate*—rather than *trial*—counsel, the prejudice analysis is somewhat more complicated. The issue was not raised in the motion for new trial, as is required by Tennessee Rule of Appellate Procedure 3. Nor does the record indicate that Petitioner objected to the instructions at trial. Thus, the issue would have been waived on direct appeal. See Tenn. R. App. P. 3(e); State v. Haynes, 720 S.W.2d 76, 84-85 (Tenn. Crim. App. 1986); see also State v. Corey Finley, No. W2005-

02804-CCA-R3-CD, 2007 WL 1651879, at *6 (Tenn. Crim. App. at Jackson, June 7, 2007). Had counsel raised it on appeal, it would have been reviewed for plain error. See Tenn. R. App. P. 36(b).[2] Plain error requires that (1) the record clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error).

Omitting the circumstantial evidence instruction was plain error in this case. The record clearly shows that the evidence upon which the State relied for the theft count was exclusively circumstantial. It also shows that the circumstantial evidence instruction was not given, nor was the jury given any other special instruction to guide its evaluation of the evidence against Petitioner on this count. Our case law has long held that when the incriminating evidence is exclusively circumstantial, "the failure of the judge to instruct the jury the law of circumstantial evidence, *whether or not the respondent requests such instructions*, is fundamental reversible error." Thompson, 519 S.W.2d at 792 (citing cases) (emphasis added); see also State v. Caldwell, 671 S.W.2d 459, 465-66 (Tenn. 1984). Thus, there is a reasonable probability that, but for counsel's unprofessional errors, Petitioner's conviction on Count II would have been reversed on appeal.

We therefore conclude that Petitioner has demonstrated that he received ineffective assistance of counsel with respect to his conviction for theft of property valued at $1,000 or more but less than $10,000 in Count II and that he is entitled to a new trial on that count.

### III.  Conclusion

For the foregoing reasons, we affirm the judgment of the post-conviction court in part and reverse it in part. The case is remanded to the trial court further proceedings consistent with this opinion.

_____
NORMA McGEE OGLE, JUDGE

---

[2] In addition, at the time of Petitioner's direct appeal, Tennessee Rule of Criminal Procedure 52(b) authorized plain error review. Since then, however, Rule 52 was reserved in favor of the amended rule of appellate procedure. Regardless, this issue could have been reviewed for plain error had it been raised on appeal.